# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **PETER BRIEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-10395-DJC** |
| | ) | |
| **METROPOLITAN LIFE INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    September 21, 2012

## I.      Introduction

Plaintiff Peter Brien ("Brien") brings this action against the Metropolitan Life Insurance Company ("MetLife") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 *et seq.*, alleging that MetLife improperly denied him long-term disability benefits.  Brien and MetLife have each moved for judgment on the record.  For the reasons set forth below, MetLife's motion is GRANTED and Brien's motion is DENIED.

## II.     Factual and Procedural Background

### A.      The Plan

Brien was employed by Ferguson Enterprises, Inc. ("Ferguson") as a warehouse clerk. AR 889. [1]   As an employee of Ferguson, Brien participated in the Ferguson Enterprises, Inc. Flexible Benefits Plan (the "Plan"), an ERISA-governed employee welfare benefit plan.  _See_

---

[1] Unless otherwise noted, all facts are drawn from the administrative record ("AR") at D. 21.

Compl., D. 1 at ¶ 3.   Ferguson administered the Plan, but MetLife is the claims administrator.

AR 1194, 1216–17.   Specifically, MetLife has "discretionary authority to interpret the terms of

the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the

terms of the Plan," and its decisions "pursuant to such discretionary authority" are entitled to

"full force and effect, unless it can be shown that the interpretation or determination was

arbitrary and capricious."   AR 1218.   MetLife is also liable for benefits payable under the Plan.

AR 1216.

> Under the terms of the Plan, a claimant is "Disabled" or suffers from a "Disability" if,
>
> due to Sickness or as a direct result of accidental injury[,] [is] receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and . . .  [is] unable to earn:  during the Elimination Period[2] and the next 24 months of Sickness or accidental injury, more than 80% of [the claimant's] Predisability Earnings at [the claimant's previous] Occupation from any employer in [the claimant's] Local Economy; and after such period, more than 60% of [the claimant's] Predisability Earnings from any employer in [the claimant's] Local Economy at any gainful occupation for which [the claimant is] reasonably qualified taking into account [the claimant's] training, education and experience.

AR 1183.

Under the Plan, claimants who become disabled before age 62 are entitled to Long Term

Disability ("LTD") benefits until they reach age 67.   AR 1182.   However, the Plan's Limited

Disability Benefits ("LDB") provision limits recovery of benefits for certain disabilities to a

maximum of 24 months.   AR 1203.   The Plan provides that if a claimant is "[d]isabled due to [a]

[n]euromusculoskeletal and soft tissue disorder including, but not limited to, any disease or

disorder of the spine or extremities and their surrounding soft tissue; including sprains and

strains of joints and adjacent muscles," disability benefits will be limited to a period of 24

---

[2] Under the Plan, an "Elimination Period" is a "period of [the claimant's] Disability during which [MetLife] do[es] not pay benefits" and "begins on the day [the claimant] becomes Disabled and continues" for 90 days in Brien's case.  AR 1184, 892.

months, "unless the Disability has objective evidence" of any of the six following conditions: "Seropositive Arthritis; Spinal Tumors, malignancy, or Vascular Malformations; Radiculopathies; Myelopathies; Traumatic Spinal Cord Necrosis; or Myopathies."  AR 1203. These exclusionary conditions are individually defined in the Plan; radiculopathies, which are relevant to Brien's claim, are defined as "disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology."  AR 1203.

### B.    Brien's Medical History

Brien last worked for Ferguson on July 6, 2007.  AR 905.  On that date, Brien was involved in a car accident.  AR 674.  Brien may have had a seizure while operating his car.  AR 320, 676.  Prior to the accident, Brien had not had a seizure for at least ten years.  AR 676, 773. At the time of the accident, Brien (then age 43) had been taking Dilantin daily for epilepsy.  AR 320, 676, 896.  However, Brien may have "missed a few doses of his Dilantin" prior to the accident.  AR 320.

Upon admission to the emergency room after the accident, Brien "had a low Dilantin level of less than 3.5."  AR 830.  At that time, his "primary complaint [was] low back pain."  AR 676.  Brien denied neck pain, clavicle pain, shoulder pain, elbow pain, wrist pain, hand pain, finger pain, hip pain, knee pain, ankle pain and foot pain.  AR 676.  A CT scan of Brien's lumbar spine showed "subtle compression of the T11 vertebral body" and a "compression fracture" of the T12 vertebral body.  AR 928.  "The fracture involve[d] only the vertebral body and [did] not . . . extend into the spinal ring."  AR 928.  In addition, "[n]o evidence of spinal stenosis, displaced fragment, or posterior spinal fractures [was] seen."  AR 928.

On July 9, 2007, Brien was seen by Dr. Marie Pilar Elisa Dayaw, a neurologist at Milford Regional Medical Center.  AR 773.  Dr. Dayaw reported that Brien had "no motor or sensory deficits" and his EEG was "normal."  AR 773, 701.

Brien was discharged from the hospital on July 10, 2007.  AR 830.  The discharge summary indicated that Brien had had an EEG which "showed no evidence of seizure activity." AR 830.  The "T11-T12 compression fracture" was causing him "quite [an] amount of pain," which was "managed with Percocet and Flexeril as needed."  AR 830.  He was also instructed not to drive for six months "until cleared by [a] neurologist."  AR 831.

On July 13, 2007, Dr. Faheem M. Farooq, Brien's primary care physician, reported that Brien was "not able to return to work until further notice" because of his T11 and T12 compression fractures.  AR 514.  On July 20, 2007, Brien saw Dr. Nicholas A. Mastroianni Jr., an orthopedic surgeon, and reported to the doctor that he had "developed some right shoulder pain" since the accident.  AR 926.  Dr. Mastroianni opined that the x-rays of Brien's shoulder were "unremarkable."  AR 926.  At an August 10, 2007 visit, Dr. Mastroianni noted that Brien had "some sciatica on his left side" and the doctor hypothesized that this was "on the basis of muscle strain."  AR 925.  Brien saw Dr. Mastroianni again on September 4, 2007 and Brien reported that he was "doing better."  AR 923.  Dr. Mastroianni reviewed an x-ray of the thoracic lumbar spine and stated that the T11 was "essentially nondisplaced" and the T12 "show[ed] significant wedging."  AR 923.  Dr. Mastroianni told Brien that he should discuss with his employer the possibility of returning to work with limited lifting responsibilities.  AR 923.  Dr. Mastroianni saw Brien on September 25, 2007 and told him that his x-ray, "while it show[ed] significant compression, was unchanged in position from the earlier pictures and in terms of

density of healing now looked quite strongly improved." AR 921. By his October 31, 2007 visit with Dr. Mastroianni, Brien's x-rays showed that the T12 fracture was "pretty solidly healed, but with about 50 to 60% of compression." AR 927.

### C.    Brien's Claim for Benefits

In early November 2007, Brien made a claim for LTD benefits under the Plan. AR 933. Brien reported being unable to work because he was "recuperating from compression fracture[s] of two vertebrae and muscle spasms." AR 905. He also noted that he was under "doctor[']s orders to lift no more than ten pounds" and was "not allowed to drive for six months after [his] seizure" under Massachusetts law. AR 896, 899. In support of his claim, Brien provided an Attending Physician Statement ("APS") from Dr. Mastroianni stating that Brien's diagnosis was a "compression fracture" of the T11 and T12 vertebrae, AR 918, and attached Dr. Mastroianni's notes from Brien's visits with him after the accident. AR 921–932.

On December 3, 2007, after its review of his file, MetLife advised Brien that his "claim for Long Term Disability benefits [had] been approved effective October 5, 2007." AR 892. On December 13, 2007, MetLife informed Brien that his "[c]ompression [f]racture medical condition is considered a Limited Disability Condition and is only payable for a total of 24 months provided [Brien] continue[s] to meet the definition of disability." AR 884 (emphasis in original).

### D.    Brien's Medical Treatment Between 2007 and 2010

On December 5, 2007, Brien saw Dr. Mastroianni and complained of pain at the base of his neck, "tingling" and "some numbness down both upper extremities, right more than left," and

a lack of "good sensation in his fingers."  AR 239.  Dr. Mastroianni stated that Brien's fractures had healed, but that Brien complained that his neck pain had "moved to center stage."  AR 239.

Brien had a follow-up visit with Dr. Farooq on January 9, 2008.  AR 145.  Dr. Farooq noted four medical problems that had "improved":  (1) "seizure disorder" (Dr. Farooq noted that Brien had not had a seizure since his last visit); (2) "vertebral fracture, thoracic spine"; (3) "cervical strain" (upon physical examination, Dr. Farooq noted "minimal right posterior cervical tenderness with normal range of motion"); and (4) "shoulder strain, right."  AR 145–47.  Brien's neurologic exam was normal.  AR 146.

Dr. Mastroianni completed another APS in March 2008 and again reported that Brien's diagnosis was compression fractures.  AR 868.  Dr. Mastroianni indicated that Brien was unable to perform job duties because of his pain and inability to "flex/bend [his] back."  AR 869.

On April 23, 2008, Dr. Farooq opined that Brien was "totally disabled and out of work because of [his] seizure disorder and fracture of thoracic vertebra as a result of a seizure-related accident."  AR 156.  At an August 8, 2008 visit, Brien complained of pain in his back, neck and right upper extremity in addition to numbness in his neck and feet.  AR 166.  The record from the visit stated that "[r]eview of the systems is negative for any seizures, no headaches, occasional problems with his vision . . . he does have a reducible small umbilical hernia."  AR 166.  Dr. Farooq noted that Brien has "noticed some pedal edema [or swelling] of both his feet." AR 166.  Upon physical examination of Brien, Dr. Farooq found "minimal right posterior cervical tenderness with normal range of motion."  AR 167.  Shortly after this visit, on August 11, 2008, Dr. Farooq completed an APS and indicated that Brien's diagnoses were a "seizure disorder" and "thoracic vertebral fracture."  AR 816.  Dr. Farooq indicated that Brien was unable

to perform job duties because of his thoracic vertebral fracture, but could work a total of four hours per day with certain limitations.  AR 817.  Dr. Farooq also indicated that he expected a decrease in Brien's back pain over the next six months.  AR 817.

On November 3, 2008, Brien visited Dr. Farooq and complained of pain "in both his upper extremities with . . . numbness" and pain in his mid and lower back.  AR 179.  A physical exam revealed "minimal right posterior cervical tenderness with normal range of motion."  AR 180.  Dr. Farooq listed "seizure disorder" and "vertebral fracture, thoracic spine" as "unchanged" problems and "cervical radiculopathy" as a "new" problem.  AR 181.  For this new problem, Dr. Farooq ordered an EMG of both upper extremities and a CT scan of the C-spine.  AR 181.

On December 5, 2008, Brien visited, upon Dr. Dayaw's request, Dr. Herbert Cares, a neurosurgeon.  AR 225.  According to Dr. Cares, Brien's "cervical and thoracic MRI studies from November 15th, 2008 show the old compression fracture at T12 and some modest abnormalities at C3-4 on the right and C5-6 on the left that are clinically fortuitous."  AR 225.  Brien also told Dr. Cares that he had a "recent EMG that show[ed] bilateral carpal tunnel syndrome."  AR 225.  Dr. Cares advised Dr. Dayaw to "manage [Brien] symptomatically" and that he "expect[ed] [Brien's] symptoms to gradually burn out."  AR 225.

On December 3, 2008, Brien had an EMG.  AR 596.  Dr. Dayaw reported that this was an "abnormal EMG consistent with bilateral sensory/motor neuropathy of the distal medial nerve" and was "consistent with carpal tunnel syndrome."  AR 596.

On May 13, 2010, Brien had another EMG.  AR 251.  Dr. Alan Bell reviewed the results and reported that "the normal needle examination suggests that the slowing of conduction is a

technical artifact" and that he could "detect no evidence for denervation, specifically no evidence for . . . radiculopathy." AR 251.

      **E.**      **Brien's First Administrative Appeal**

On September 28, 2009, MetLife notified Brien that his benefits would end on October 4, 2009. AR 741. On March 22, 2010, Brien appealed the "termination of his Long Term Disability benefits" and claimed that "the termination of his benefits after twenty four months without an evaluation of whether his condition met the policy disability criteria/definition [for LTD benefits] after twenty four months was unreasonable based on his past and current medical conditions that clearly meet the policy definition for disability after twenty four months." AR 504. In support of his appeal, Brien submitted medical records from the Milford Regional Medical Center and Drs. Richard Fraser, Farooq, Dayaw and Mastroianni. AR 506.

      *1. Dr. Fraser's Opinion*

Dr. Fraser, at the request of Brien's counsel, examined Brien on March 19, 2010. AR 508, 453. Dr. Fraser noted that Brien's seizures were "well-controlled with Dilantin." AR 508. At the visit, Brien described "pain throughout his neck radiating to both arms and hands" and "persistent mid back pain with muscle spasm throughout the mid left and right flank." AR 508. According to Dr. Fraser, "further complicating [Brien's] condition is that [Brien] has developed carpal tunnel syndrome." AR 508. Brien explained to Dr. Fraser that he had "poor grip strength" and difficulty with simple manipulations. AR 508. Although he did not opine that Brien suffered from a radiculopathy, Dr. Fraser concluded that Brien met the Social Security Administration Listing 1.04 for disorders of the spine. AR 510.

2.  *Dr. Gordon's Opinion*

In April 2010, MetLife had Dr. Dennis Gordon, an independent physician, review Brien's file and prepare a report and opinion.  AR 484–498.  As part of his review, Dr. Gordon conferred with Dr. Dayaw.  Dr. Gordon noted the following:

> Suspicion of cervical and lumbar radiculopathies was the reason for the 12/3/08 electrodiagnostic testing, but the only findings were of relatively mild bilateral carpal tunnel syndrome, and an incidental and unexplained slowing of right ulnar nerve conduction between the brachial plexus and the elbow.  Dr. Dayaw wrote [12/3/08] that there might, therefore, be an early ulnar neuropathy, and recommended clinical correlation.  Although Dr. Faroo[q] took up that diagnosis [12/26/08] he did nothing to confirm it, and Dr. Dayaw dropped it from her later notes.  There was no evidence of upper limb radiculopathy, and Dr. Dayaw later continued it only as a possibility.  There is no lower limb electrodiagnostic testing in the file, and the physical examination findings there do not support radiculopathy.

AR 487.   Dr. Dayaw agreed that "the possibility of ulnar neuropathy was just that—a possibility—and remained unconfirmed."   AR 498.   Dr. Gordon also noted that "[u]lnar neuropathy most commonly involves the slowing of nerve conduction from above elbow to below elbow, which was not the case here."  AR 487.

Dr. Gordon was asked to opine about whether "the medical information support[s] continuous physical functional limitations related to the diagnoses/conditions beyond 10/4/09." AR 488.  Dr. Gordon noted that Brien's only medical examination after October 4, 2009 was Dr. Fraser's, which "appear[ed] cursory."  AR 488.  According to Dr. Gordon, the "only conditions that may be causing functional problems would appear to be the bilateral carpal tunnel syndromes (where the evidence is not consistent) and the residuals from his vertebral compression fractures."  AR 488.  He noted that Brien's "carpal tunnel syndrome is relatively mild" and that there was "no atrophy."  AR 488.

On April 28, 2010, MetLife sent Dr. Gordon's report to Drs. Dayaw, Mastroianni, Farooq and Fraser for comment, AR 435, 479–82, but only Dr. Fraser responded.  AR 435.  Dr. Fraser commented that "[o]ther specialists diagnosed a cervical radiculopathy."  AR 463.  In response, Dr. Gordon stated, "[t]he specialists best qualified to make the diagnosis did not do so.  Although Dr. Dayaw, [a] neurologist, entertained the possibility of radiculopathy, her further testing led to her withdrawal of it as a diagnosis.  Dr. Cares, [a] neurosurgeon, never suggested it."  AR 455.  In his comments, Dr. Fraser also defined radiculopathy as a "term used more for chronic pain unresponsive to treatment," AR 462, and Dr. Gordon responded that "he is nearly alone in that opinion."  AR 454.  Dr. Fraser did not dispute Dr. Gordon's EMG findings, but noted that "[i]t is a well-established fact that EMGs can be normal in 8% of patients with carpal tunnel syndrome."  AR 463.  Dr. Fraser also commented that "Dr. Gordon did not examine Mr. Brien or take a personal history, relying on misinterpretation of the medical records and questioning the findings of other specialists."  AR 463.

### 3.  *MetLife Upholds its Determination*

On May 19, 2010, MetLife notified Brien that its "original determination to terminate benefits beyond October 4, 2009 was upheld upon appeal review."  AR 431.  The letter advising Brien of its decision summarized Brien's file, including Dr. Fraser's and Dr. Gordon's opinions. AR 431–438.  MetLife determined that the medical documentation on file contained diagnoses of "nerve pain, back pain/muscle spasm, neck pain radiating to arms/hands, cervical strain, compression fracture [T]11-[T]12, shoulder strain (right), degenerative disc disease thoracic spine, disc bulges, seizure disorder, neuropathy, carpal tunnel syndrome, edema and cervical radiculopathy."  AR 433.  MetLife determined that Brien was disabled due only to the nerve

pain, back pain/muscle spasm, radiating neck pain, cervical strain, compression fractures, shoulder strain, degenerative disc disease and disc bulges, which were considered neuromusculoskeletal and soft tissue disorders and thus fell under the LDB provision.  AR 436. With regards to the remaining diagnoses of neuropathy, carpal tunnel syndrome, seizure disorder, edema and cervical radiculopathy, MetLife "determined that there was insufficient clinical evidence to support restrictions and/or limitations at a severity that would have prevented Mr. Brien from functioning beyond October 4, 2009."  AR 436–37.  MetLife advised Brien of his right to appeal "the decision based on the diagnoses of neuropathy, carpal tunnel syndrome, edema and cervical radiculopathy as these were not evaluated in his initial termination letter." AR 437.

### F.      Brien's Second Administrative Appeal

On November 10, 2010, Brien filed a second administrative appeal.  AR 131.  Brien asserted that his disability did not fall under the Plan's LDB provision because his medical record contained objective evidence of radiculopathies.  AR 131.  In support of this claim, Brien pointed to a MRI performed on November 10, 2009 and the fact that Dr. Dayaw "prescribed a course of physical therapy to treat Mr. Brien's cervical and lumbar radiculopathies."  AR 132. Brien also suggested that he was disabled "due to a combination of disabilities that includes disabilities that are not limited by the 'Limited Disability Benefits' provision."  AR 131. Specifically, Brien pointed to an EMG test performed on December 3, 2008 that "indicated bilateral carpal tunnel syndrome."  AR 132.

In the course of the second administrative appeal, MetLife had two independent physicians, Drs. Elyssa Del Valle and Malcolm McPhee, review Brien's entire file and issue reports.

### 1. Dr. Del Valle's Opinion

Dr. Del Valle, an internist, issued a report on December 5, 2010.  AR 119–124.  Her report concluded that the medical records did not support a diagnosis of radiculopathies.  AR 122.  In support of this conclusion, Dr. Del Valle noted the absence of atrophy or loss of muscle tone "which one would expect with any significant radiculopathy or neuromuscular disorder." AR 122.  Dr. Del Valle also stated that Dr. Dayaw, a neurologist, had "not found any physical findings consistent with a level of function that would be consistent with radiculopathy or serious neuromuscular or skeletal disorder."  AR 123.  According to Dr. Del Valle, Dr. Dayaw "specifically documented 5/5 motor strength, normal sensory exam and reflexes with normal muscle tone and no atrophy," which are "very pertinent findings that do not support" a finding of a radiculopathy.  AR 123.  Dr. Del Valle also concluded that Dr. Farooq's findings "also indicate[] the absence of neurologic deficits for significant radiculopathy."  AR 123.

The report did conclude that the medical evidence supported the diagnoses of "mild carpal tunnel syndrome, stable compression fractures of T11 and T12 [vertebrae], degenerative disc disease from chronic spondylosis with mild neuroforaminal narrowing and mild spinal stenosis without nerve root compression or evidence of motor/sensory findings."  AR 122.  Dr. Del Valle noted that on December 3, 2008 Brien was diagnosed with bilateral carpal tunnel syndrome, "which is a peripheral neuropathy rather than . . . [a] cervical nerve root disorder."

AR 123.  Dr. Del Valle opined that Brien's "mild carpal tunnel syndrome" could be "treated by wearing Cox splints."  AR 123.

On January 4, 2011, Dr. Del Valle spoke with Dr. Dayaw.  AR 59.  Dr. Dayaw agreed with Dr. Del Valle that Brien did not have a radiculopathy or neuropathy.  AR 59.  Dr. Dayaw told Dr. Del Valle that Brien had wanted her to support his disability claim, but she explained to him that "she could not and that he would need to obtain this from elsewhere if this was his intention."  AR 59.  Dr. Dayaw explained that Brien had no documented seizures since the car accident, his EEG was normal and "[t]hus from the standpoint of seizures, there was no clinical evidence to warrant limitations of function."  AR 59.

On January 5, 2011, Dr. Del Valle spoke with Dr. Farooq to inquire "whether there were any clinical findings or data to support functional impairment."  AR 60.  Dr. Farooq stated he could not find "any specific neurological or muscular deficits that would explain [Brien's] multitude of symptoms" and that "the only findings are the claimant's reported symptoms that sound like radicular pain[,] but the studies have not shown this to be the case."  AR 60.

### 2.  Dr. McPhee's Opinion

On December 10, 2010, Dr. McPhee issued a report.  AR 105–118.  Dr. McPhee specifically addressed each of the following conditions noted in Brien's file:  seizure disorder, cervical radiculopathy, neuropathy, carpal tunnel syndrome and pedal edema.  AR 116.

The report stated that Brien's seizure disorder was "well controlled with medication" and that when Brien stopped taking his medication regularly the seizure that caused the car accident occurred, but "was soon well controlled again."  AR 117.  On January 7, 2011, Dr. McPhee spoke with Dr. Farooq who confirmed that Brien has no seizures as long as he takes Dilantin.

AR 56.  Dr. McPhee concluded that this disorder "would not preclude work activity" and Dr. Farooq agreed.  AR 117, 56.

The report stated that there were "no EMG findings to support" cervical radiculopathy. AR 117.  Dr. McPhee explained:

> [t]he physical examinations by Dr. Dayaw showed no focal weakness to support a cervical radiculopathy or a lumbar radiculopathy.  The most recent lumbar MRI study of 11/10/2009 showed multilevel diffuse disc bulges.  At L5-S1, a broad-based disc bulge was described as extending to the right L5-S1 foramen possibly abutting the exiting L5 nerve root.  However, the EMG study showed no findings for focal denervation and clinical exam was non-focal as well.

AR 117.  Dr. McPhee noted that "[n]eedle electromyography [EMG] is the single most useful procedure diagnostically in cases of suspected radiculopathy."  AR 117.

Dr. McPhee explained that the "condition of neuropathy was considered as a possibility when an electrodiagnostic study by [Dr. Dayaw], neurology, on 12/03/2008 found a []questionable drop in ulnar nerve conduction velocities from 62.5 below the right elbow to 47.1 above the elbow as well as mildly prolonged F wave latencies."  AR 116–117.  However, Dr. Dayaw "later dropped [the] possibility [of neuropathy] from her clinical notes."  AR 117. Furthermore, Dr. McPhee noted that "[b]ilateral lower limb conduction studies performed on 5/12/2010 found no evidence of neuropathy."  AR 117.

Dr. McPhee stated that Brien's carpal tunnel syndrome "would not preclude work activity."  AR 117.  Dr. McPhee explained:

> Brien's condition of bilateral carpal tunnel syndrome was based on an incidental finding during an electrodiagnostic study performed [on] 12/3/2008 which showed mild motor median nerve latencies across the wrists . . . associated with normal sensory latencies.  Such minimal findings could be seen in a cool environment and if present at warmer temperatures, often respond to conservative treatment.

14

AR 117.

Dr. McPhee also stated that Brien's pedal edema "would not preclude work activity." AR 117. The report explained that Brien's pedal edema was noted only by Dr. Farooq on August 8, 2008 as a conclusion and that it "was not clearly described or attributed to any underlying pathology and was not found on further examinations." AR 117.

In conclusion, Dr. McPhee stated:

> The conditions of seizure disorder which is controlled, possible cervical radiculopathy that was not supported, possible neuropathy that was ruled out, carpal tunnel syndrome of mild degree that should be controlled with conservative treatment and pedal edema that [was] resolved[,] taken individually or in total[,] would not prevent the claimant from performing his own or any gainful occupation.

AR 118.

On January 13, 2011, MetLife sent a copy of Dr. Del Valle's and Dr. McPhee's reports to Drs. Mastroianni, Dayaw, Fraser and Farooq for comment, AR 30–39, and only Dr. Fraser responded with a report. AR 14, 15, 26.

Dr. Fraser's report contested Dr. Del Valle's assessment that Brien's carpal tunnel syndrome was mild because it interfered with Brien's ability to "open jars, turn keys, turn doorknobs and hold a cup of coffee." AR 26. Dr. Fraser also noted Brien's complaints about his symptoms and stated that "EMG[s] are not 100% reliable and ignore the symptoms and physical findings seen on [Brien's] examination." AR 27.

### 3. *MetLife Upholds its Determination*

On February 28, 2011, MetLife informed Brien that it had completed its review of his claim and stated that "the original determination to terminate benefits beyond October 4, 2009 is

15

being upheld upon appeal review."  AR 7.  MetLife's letter informing Brien of its decision

recounted the steps MetLife had taken in reviewing Brien's claim and stated:

> Again this appeal could not consider Mr. Brien's diagnoses of nerve pain, back
> pain/muscle spasm, neck pain radiating to arms/hands, cervical strain,
> compression fracture [T]11-[T]12, shoulder strain (right), degenerative disc
> disease thoracic spine and disc bulges, as these conditions fell under the Limited
> Benefit Condition Plan provision which were not payable beyond the maximum
> 24 months of benefits, or October 4, 2010.
>
> In summary, in reference to the diagnoses of neuropathy, carpal tunnel syndrome,
> edema and cervical radiculopathy[,] benefits must be administered in accordance
> with the employer's Plan and this required that the disability be defined and
> medically substantiated by the providers with comprehensive and specific
> information.  The medical records on file did not support a severity of impairment
> that resulted in functional limitations or restrictions that prevented Mr. Brien from
> performing his own occupation beyond October 4, 2009.

AR 15–16.  Accordingly, MetLife stated that the "original claim determination was appropriate

and Mr. Brien's claim will remain terminated beyond October 4, 2009."  AR 16.

### G.    Brien Seeks Judicial Review

On March 8, 2011, Brien filed the instant complaint, alleging that Brien is entitled to

LTD benefits under the Plan.  Compl. D. 1 at ¶¶ 13, 19.

On November 15, 2011, Brien moved for judgment on the record and submitted a brief

arguing that Brien's disability is not subject to the Plan's LDB provision because (1) Brien

suffers from a combination of impairments, many of which do not fall under the Plan's LDB

provision and (2) there was objective evidence of radiculopathies in the record.  Pl. Mot., D. 14

at 4, 7.  On December 29, 2011, MetLife cross-moved for judgment on the record.  Def. Mot., D.

17.  The Court heard argument on the cross-motions on May 23, 2012 and took the matter under

advisement.

III.    **Discussion**

A.    **Standard of Review**

Where an ERISA plan administrator is granted clear discretionary authority to determine

eligibility for benefits or to construe the terms of the plan at issue, then the review of its claims

determination under 29 U.S.C. § 1132(a)(1)(B) is made under the arbitrary and capricious/abuse

of discretion standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 107, 115 (1989);

Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009).  This standard

of review is deferential; that is, "the administrator's decision must be upheld if it is reasoned and

supported by substantial evidence."  Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir.

2004).  "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the

existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."

Id.

The parties agree that this deferential standard of review applies here where the Plan

states that MetLife "shall have discretionary authority to interpret the terms of the Plan and to

determine eligibility for and entitlement to Plan benefits in accordance with the terms of the

Plan."  AR 1218; Def. Mot., D. 17 at 16–17; Pl. Mot., D. 14 at 2.[3]

---

[3]    Where an ERISA plan administrator "both determines whether an employee is eligible
for benefits and pays benefits out of its own pocket. . . . this dual role creates a conflict of
interest."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).  Where such a conflict exists,
"a reviewing court should consider that conflict as a factor in determining whether the plan
administrator has abused its discretion in denying benefits."  Id.

Here, MetLife both determines whether claims for LTD benefits satisfy the terms of the
Plan and is liable for benefits payable under the Plan, AR 1216, 1218, and accordingly, such
structural conflict of interest exists.  MetLife initially approved Brien's claim and paid him
benefits for 24 months pursuant to the Plan's LDB provision.  AR 884.  A decision to award at
least some benefits rather than deny benefits entirely "manifest[s] an approach demonstrating an
unbiased interest that favor[s the claim applicant], making the conflict factor 'less important
(perhaps to the vanishing point).'"  Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 362

**B.    MetLife's Determination that Brien is Disabled Due To Neuromusculoskeletal and Soft Tissue Disorders and thus Subject to the LDB Provision was Reasoned and Supported by Substantial Evidence**

Brien filed a claim for LTD benefits and reported being unable to work because he was "recuperating from compression fracture[s] of two vertebrae and [had] muscle spasms" after his car accident.  AR 905.  MetLife reviewed his medical records and approved his claim for benefits, but determined that his "[c]ompression [f]racture medical condition" was considered a "Limited Disability Condition and is only payable for a total of 24 months."  AR 884. In conducting its further review upon Brien's appeal, MetLife had independent doctors review Brien's medical records and considered all of Brien's diagnoses.  AR 433.  MetLife concluded that the diagnoses of compression fractures of the T11 and T12 vertebrae, nerve pain, back pain/muscle spasms, neck pain radiating to his arms and hands, cervical strain, right shoulder strain, degenerative disc disease of the thoracic spine and disc bulges were neuromusculoskeletal and soft tissue disorders and thus subject to the Plan's LDB provision limiting the payment of benefits to 24 months.  AR 436.  In regard to the remaining diagnoses, MetLife determined that there was insufficient clinical evidence to support a disability claim.  AR 436–37.

Brien appealed again claiming that he "is disabled due to a combination of disabilities that includes disabilities that are not limited by the 'Limited Disability Benefits' provision."  AR 131.   Independent physicians then reviewed Brien's file, considered Brien's non-

---

(4th Cir. 2008) (quoting Glenn, 554 U.S. at 117).  Further, MetLife protected the integrity of its claims-determination process by referring Brien's appeals to independent physicians for review. AR 498, 124, 118.  Brien does not assert that MetLife's decision to limit his benefits was an "actual conflict," or, to use Denmark's language, an "instance[] in which the fiduciary's decision was in fact motivated by a conflicting interest."  Denmark, 566 F.3d at 5 n.2; see Pl. Mot., D. 14 at 2–4.  Consequently, a structural conflict "will act as a tiebreaker" if the relevant considerations are "closely balanced."  Denmark, 556 F.3d at 9 (quoting Glenn, 554 U.S. at 117).  However, for the reasons discussed below, the Court finds that the considerations in this case are not closely balanced and, therefore, the Court has not accorded MetLife's structural conflict dispositive weight.

neuromusculoskeletal and soft tissue disorders—neuropathy, carpal tunnel syndrome, seizure disorder and pedal edema—and determined that they were not, either "taken individually or in total," disabling.  See AR 118, 16, 437.  Accordingly, MetLife affirmed its decision that Brien's disabling conditions were the neuromusculoskeletal and soft tissue disorders.  AR 9, 436.

The LDB provision applies if the claimant is "disabled due to . . . [a] [n]euromusculoskeletal and soft tissue disorder."  AR 1203.  Brien spends considerable time in his brief arguing that this provision does not apply because he is disabled due to a combination of impairments, some of which fall under the Plan's LDB provision and some of which do not. Pl. Mot., D. 14 at 4–7.  Brien does not dispute MetLife's determination that the diagnoses of neuropathy, carpal tunnel syndrome, seizure disorder and pedal edema were not disabling (individually or in the aggregate).  Rather, Brien argues that his "overall disability" is caused by the combination of these non-disabling disorders and the disabling neuromusculoskeletal and soft tissue disorders and therefore, his disability is not subject to the LDB provision.[4]  See Pl. Mot., D. 14 at 4–7.  MetLife argues that Brien's approach requires an interpretation of the Plan such that the LDB provision applies only if Brien is disabled "solely" due to neuromusculoskeletal and soft tissue disorders and that this is not what the terms of the Plan provide.  Def. Mot., D. 17 at 23.  MetLife argues that it is "more than reasonable to interpret the Plan as providing that the LDB provision applies if, as here, a disability is predominantly caused by neuromusculoskeletal/soft tissue disorders and any non-neuromusculoskeletal/soft tissue

---

[4] Brien argues that the Plan is ambiguous and thus, based on state law rules regarding the interpretation of insurance contracts, ambiguous provisions should be read in the insured's favor. Pl. Mot., D. 14 at 5.  However, "the doctrine of contra proferentem does not apply to review of an ERISA plan construction advanced by an administrator given authority to construe the plan." D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 35 (1st Cir. 2011).

disorders, individually or in combination, are not independently disabling." Def. Mot., D. 17 at 23 (emphasis in original).

The Court concludes that MetLife's interpretation of the Plan is reasonable. See D & H Therapy Assocs., LLC, 640 F.3d at 35 (noting that "review of whether a plan administrator abused its discretion does not require that [the Court] determine either the 'best reading' of the ERISA plan or how [the Court] would read the plan de novo"). It is a reasonable interpretation particularly here where none of the other disorders were independently disabling and it is the neuromusculoskeletal/soft tissue disorders that rendered Brien disabled and eligible for benefits. To conclude otherwise, as MetLife argues, would render the "LDB provision meaningless, as no condition, however minor, is ever going to make an already disabled individual any less disabled." Def. Mot., D. 17 at 23. Therefore, it was not an abuse of discretion for MetLife to determine that the LDB provision was applicable where Brien was not disabled but for the presence of his neuromusculoskeletal and soft tissue disorders. Cf. Lee v. Kaiser Found. Health Plan Long Term Disability Plan, 812 F. Supp. 2d 1027, 1041 (N.D. Cal. 2011) (upholding MetLife's decision to limit claimant's benefits to 24 months under the mental impairment limitation where MetLife determined that the claimant was unable to work as a result of her mental condition, which predated the claimant's physical conditions, and the physical ailments were not disabling in and of themselves); Tumbleston v. A.O. Smith Corp., 28 F. App'x 231, 237 (4th Cir. 2002) (upholding plan administrator's decision to limit claimant's benefits to 24 months under the mental disease limitation where plan administrator determined that the claimant was disabled due to major depression and anxiety and that claimant had not demonstrated that she was disabled as a result "of her physical maladies alone").

**C.     MetLife's Determination that There was No Objective Evidence of
Radiculopathies was Reasoned and Supported by Substantial Evidence**

As discussed above, MetLife determined that Brien's diagnoses of nerve pain, back
pain/muscle spasms, neck pain radiating to his arms and hands, cervical strain, compression
fractures of the T11 and T12 vertebrae, right shoulder strain, degenerative disc disease of the
thoracic spine and disc bulges were neuromusculoskeletal and soft tissue disorders and therefore
fell under the Plan's LDB provision.  AR 9.  This provision does not apply if "the Disability has
objective evidence of . . . Radiculopathies."   AR 1203.   Brien argues that MetLife's
determination that there was no objective evidence of radiculopathies was an abuse of discretion
and arbitrary and capricious.  Pl. Mot., D. 14 at 10.  Specifically, Brien argues that it was
improper for MetLife to engage in a "weighing of the objective evidence" and should have
considered contrary evidence in determining whether there was objective evidence of
radiculopathies.  Id.  The Court finds these arguments unavailing.

First, although Brien contends that certain "imaging findings" constituted objective
evidence of radiculopathies, AR 184–85, AR 555-58, AR 260–65, Pl. Mot., D. 14 at 8–9, he does
not point to any medical opinions in the record supporting his assertion that these MRIs were
"proof of nerve root disease."  Pl. Mot., D. 14 at 9.  Brien only points to Dr. Farooq's
"hypothesis" after reviewing the November 15, 2008 MRI that Brien had "degenerative disc
disease [of the] cervical spine [with] radiculopathy."  Id.; AR 560.  However, Dr. Farooq later
withdrew this hypothesis when he explained to Dr. Del Valle that the "only findings are [Brien's]
reported symptoms that sound like radicular pain[,] but the studies have not shown this to be the
case."  AR 60.

21

Second, there is substantial evidence in the record supporting MetLife's determination that there was no objective evidence of radiculopathies.  On December 3, 2008 and May 13, 2010, Brien had an EMG, which, according to Dr. McPhee, is "the single most useful procedure diagnostically in cases of suspected radiculopathy."  AR 596, 117.  Dr. McPhee stated that the "possibility of cervical radiculopathy and lumbar radiculopathy was . . . studied with no needle EMG findings to support this condition."  AR 117.  Dr. Del Valle said that the "EMG did not reveal evidence of cervical radiculopathy."  AR 123.  Furthermore, after a review of the entire record, Dr. Del Valle ultimately concluded that "[t]he medical information reviewed [did] not support the diagnoses [of] . . . radiculopathies," AR 122, and Dr. Dayaw agreed that "a radiculopathy was ruled out."  AR 59.  Dr. Gordon's report noted that "[s]uspicion of cervical and lumbar radiculopathies was the reason for the 12/3/08 electrodiagnostic testing," but the suspicion was not confirmed by the testing.  AR 487.  Dr. Bell administered the May 13, 2010 EMG and concluded that he could "detect no evidence for denervation, specifically no evidence for . . . radiculopathy."  AR 251.

Third, Brien's argument that it was improper for MetLife to "engage[] in weighing of the objective evidence in order to find that the Limited Disability provision applied" because the Plan does "not provide for a process of considering the balance of the weight [of] competing objective evidence offered," Pl. Mot., D.14 at 9–10, is not persuasive.  In support of this contention, Brien points to MetLife's February 28, 2011 letter denying Brien's second appeal:

> The consultant went on to explain the possibility of cervical radiculopathy and lumbar radiculopathy was also studied with no needle EMG findings to support these conditions.  The physical examinations of Dr. Dayaw showed no focal weakness to support a cervical radiculopathy or a lumbar radiculopathy.  The most recent lumbar MRI study of November 10, 2009 showed multilevel diffuse disc bulges.  At L5-S1, a broad-based disc bulge was described as extending to the right L5-S1 foramen possibly abutting the exiting L5 nerve root.  However,

the EMG study showed no findings for focal denervation and clinical examination
was non-focal as well.

AR 10.  However, Brien fails to point to any medical opinion construing the November 10, 2009 MRI to be objective evidence of radiculopathies.   Therefore, it is not readily apparent that MetLife was "weighing" conflicting objective evidence of radiculopathies.   Finally, this argument fails to recognize that it is MetLife's responsibility to weigh conflicting evidence. Vlass v. Raytheon Emps. Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001).  "[T]he existence of medical evidence pointing in two directions does not render arbitrary or capricious a plan administrator's decision to credit one viewpoint or the other."  Buffonge v. Prudential Ins. Co. Of Am., 426 F.3d 20, 28 (1st Cir. 2005).

For all these reasons, MetLife's determination that Brien's medical records did not provide objective evidence of radiculopathies, as that term is defined in the Plan, was neither arbitrary nor capricious.

## IV.    Conclusion

For the foregoing reasons, MetLife's motion for judgment on the record is GRANTED and Brien's motion for judgment on the record is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge